RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

VICTOR DEWAYNE TAYLOR,

*Petitioner-Appellant,*

*v.*

THOMAS SIMPSON, Warden,

*Respondent-Appellee.*

No. 14-6508

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:06-cv-00181—Danny C. Reeves, District Judge.

Argued:  October 16, 2019

Decided and Filed:  August 25, 2020

Before:  BATCHELDER, COOK, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, La Grange, Kentucky, for Appellant.  Matthew R. Krygiel, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Appellee.  **ON BRIEF:**  Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, La Grange, Kentucky, Thomas M. Ransdell, Frankfort, Kentucky, for Appellant.  Matthew R. Krygiel, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Appellee.

BATCHELDER, J., delivered the opinion of the court in which COOK, J., joined, and GRIFFIN, J., joined Section II.C.  GRIFFIN, J. (pp. 29–44), delivered a separate dissenting opinion.

_____

**OPINION**

_____

ALICE M. BATCHELDER, Circuit Judge.   A Kentucky prisoner, sentenced to death, appeals the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus.   We AFFIRM.

**I.**

On the evening of Saturday, September 29, 1984, Scott Nelson and Richard Stephenson, 17-year-old students at Trinity High School in Louisville, Kentucky, were driving to a school football game at duPont Manual High School across town.   When they stopped at a restaurant to ask for directions, Victor Taylor and his cousin, George Wade, offered to help in exchange for a ride but the boys refused.   So, Taylor and Wade forced their way into the car at gunpoint and directed them to a secluded area where Taylor and Wade took the boys out of the car, had them undress, and bound and gagged them.   While Taylor was sodomizing one of the boys, Wade called Taylor by name, so Taylor murdered the boys to keep them from identifying him to the police.   Taylor and Wade stole the boys' belongings, including Trinity High School gym bags and school jackets, some cassette tapes and fireworks from the car, and the boys' watches, shoes, and even their pants.   Taylor and Wade are African-American, the two boys were both Caucasian.

The boys' bodies were found the next morning, each with a gunshot wound to the head from point-blank range.   Within days, the investigation led police to Taylor and Wade.

At about 3:45 p.m. on Wednesday, October 3, 1984, police brought Wade to the station, advised him of his *Miranda* rights, and told him he was a suspect in the murders.   Wade denied any involvement, waived his rights, and spoke with detectives. At about 8:30 p.m., Wade agreed to a polygraph examination, which was completed by 11:30 p.m., and which Wade failed.   When questioning resumed, Wade continued to deny any involvement in the murders.

The police arrested Wade for an unrelated burglary and, a short time later, Wade agreed to participate in a line-up.   A witness who had seen the abduction at the restaurant picked Wade

from the line-up as one of the abductors. At that point, Wade changed his story. Wade tape recorded a new statement, in which he confessed to the abduction, murders, and robberies, but placed full blame on Taylor as the sole shooter. He did not mention any sodomy.

When the state prosecutor indicted Wade and Taylor on charges of murder, kidnapping, robbery, and sodomy, he tried the cases separately, first Wade and then Taylor. The jury acquitted Wade of sodomy but convicted him of murder, kidnapping, and robbery, and the court imposed a life sentence.[1] Wade's direct appeal was pending at the time of Taylor's trial.

Because Taylor's trial began in March 1986, a month before *Batson v. Kentucky*, 476 U.S. 79 (1986), the controlling law about racial animus in peremptory challenges was *Swain v. Alabama*, 380 U.S. 202 (1965).[2] In selecting Taylor's jury, the prosecutor had nine peremptory challenges and he used eight of them, four to strike African-Americans, leaving only one African-American on the jury after Taylor's counsel removed an African-American woman with one of his own peremptory challenges. The prosecutor had previously entered his "juror chart" into the record, in response to Taylor's unrelated change-of-venue motion. On that chart, the prosecutor had recorded each juror's race, age, education, employment, and opinions on capital punishment.[3]

A few days later, while protesting the empaneled jury based on a fair-cross-section-violation theory, Taylor's counsel pointed to the prosecutor's removal of four of the six African-Americans. As transcribed in the record, the prosecutor responded, almost incoherently: "In accordance with the case law, the Commonwealth has no other rational reason—if I strike all it then becomes objectionable under the cases from, as I understand it, coming from California."

---

[1]At his trial, while represented by counsel, Wade testified under oath and subject to cross-examination about the same testimony that he made in his tape-recorded statement to the police that is at issue in this case.

[2]As will be discussed, *Batson*'s now-familiar three-step framework had yet to be conceived, so neither the prosecutor, defense counsel, nor the court engaged it during jury selection. But *Batson* is nonetheless the applicable law in this case because it is retroactive on direct appeal. *Griffith v. Kentucky*, 479 U.S. 314 (1987).

[3]As mentioned, the prosecutor used eight of his allotted nine peremptory challenges to strike potential jurors (four African-American and four Caucasian); of that eight, he struck five who had only a high-school education (two African-American and three Caucasian); three who were unemployed (two African-American and one Caucasian), three who worked blue-collar jobs (two African-American and one Caucasian), and five who had expressed reservations about capital punishment during the voir dire questioning (two African-American and three Caucasian).

Taylor characterizes this in his *Batson* claim, *infra*, as a voluntary admission by the prosecutor that he struck the jurors because they were African-American and that he had no other rational reason for striking them. But the State retorts that, given the context, the prosecutor was actually trying to inform the court of the developing law, in California cases, holding that when a defendant's objection to a prosecutor's peremptory strikes is based on numbers alone, it is colorable only when both of two conditions are met: (1) *all* of the African-American jurors were struck *and* (2) the prosecutor had no other rational reason for the strikes. In this light, this attempt by the prosecutor to describe the legal theory (pre-*Batson*) was not a reference to—and certainly not an admission of—his jury-selection decisions in Taylor's case. Regardless, it would be improper for us to speculate either way.

The trial court rejected Taylor's fair-cross-section argument and effectively upheld the prosecutor's use of peremptory challenges. The court added: "I believe the issue being addressed at this time [to the Supreme Court in *Batson*] [is] as to whether it is permissible to exercise your peremptory strikes whichever way you wish to. I don't know, but the record is clear as to what has been done in this case." Taylor characterizes this statement as the trial court's recognizing that the prosecutor struck African-Americans solely because they were African-American. The State retorts, however, that the trial court was actually just expressing its uncertainty as to the precise issue before the Supreme Court in *Batson* (e.g., "I believe" and "I don't know"), but that, in their proceedings, they had created a sufficient record for appeal no matter how *Batson* came out. In this light, the court's comment did not refer to the prosecutor's intent or actions when striking the jurors—and certainly was not a recognition that the prosecutor struck jurors based on race. As with the prosecutor's ambiguous comment, it would be improper for us to speculate either way. However, this does reveal that all parties at Taylor's trial were aware that race alone was a suspect basis for peremptory strikes and that *Batson* was pending in the Supreme Court.[4]

---

[4]It is immaterial but noteworthy that both the prosecutor and the trial judge were African-American. It is noteworthy because the parties raised it to the Kentucky Supreme Court in briefing the *Batson* claim on direct appeal.

When trial got underway, the prosecutor presented overwhelming evidence of Taylor's guilt, beginning with testimony from two men who witnessed the abduction from the restaurant and even chased the car until they lost it down a side street. Both men described the abduction and identified Taylor as the gunman and Wade as the accomplice.

Taylor's cousin Eugene testified that he saw Taylor, Wade, and the two victims together in a car on the night of the murders. Moreover, he testified that he was at Taylor's mother's house later that night when Taylor and Wade showed up carrying the victims' belongings: a Trinity High School gym bag, gray shoes, blue jeans, a Led Zeppelin cassette tape, a watch, a ring, and some firecrackers. Later, Eugene overheard Taylor admitting to his sister that he had murdered two white boys and asking her if the news had reported anything about it. Eugene then saw Taylor exchange pistols and money with his sister and divide the money with Wade.

A woman who had known Taylor for over ten years testified that Taylor tried to sell her a Trinity High School class ring and school jacket on the morning after the murders. She further testified that when she saw Taylor the next day, she overheard him admitting to the murders, claiming that "it's a game, it's all about beating the system." And she testified that she overheard Taylor admit to the murders again on two more occasions.

In a crawl space of an abandoned house near the crime scene, police had found blue jeans and a beige shirt. Police established that the jeans belonged to one of the victims. The shirt belonged to Taylor: one of the witness from the restaurant testified that Taylor had been wearing a beige shirt, and police forensics determined that hairs on the shirt were African-American hairs that matched Taylor's pubic and head hairs. The police also recovered the bullets that killed the boys and a firearms expert testified that the bullets were .357 magnum semi-jacketed hollow-points and all had been fired from the same gun. Later, police found matching ammunition at Taylor's residence. In the boys' abandoned car, police found some firecrackers, such as Eugene had described and that matched firecrackers the police later recovered from Taylor's residence.

The coroner testified that the autopsy found sperm in one boy's anus. An inmate testified that Taylor had sought his jailhouse legal advice, during which Taylor admitted that he shot the boys because Wade said Taylor's name while Taylor was sodomizing one of them.

Taylor's mother and sister had separate homes and Taylor divided his lodging between the two. At Taylor's mother's house, police recovered audio cassette tapes with one victim's initials written on them, twelve packages of the same firecrackers as found in the car, a radio belonging to one victim, gray shoes belonging to one victim and beige suede shoes belonging to the other, and a distinctive silver clip with brown beads and white feathers that had hung from the car's sun visor. At Taylor's sister's house, police recovered four live .357 magnum hollow-point bullets that matched those from the murders, and one victim's blue jeans with orange stitching—Taylor's brother-in-law was actually wearing the jeans when the police arrived and he testified that Taylor gave them to him. At Taylor's girlfriend's house, police recovered a jacket that had belonged to one of the victims and the girlfriend testified that Taylor had recently given her the jacket.

As its last witness, the prosecution called Wade to testify, but Wade invoked his Fifth Amendment right against self-incrimination and refused to testify because his conviction was pending on a direct appeal. The trial court found that Wade was unavailable to testify and allowed the prosecutor to play Wade's tape-recorded police statement, declaring it admissible under the exception to the hearsay rule for statements against penal interest. Wade's statement blamed the worst aspects of the crime on Taylor, particularly the kidnapping and shooting. Wade did not mention the sodomy, and, in fact, that act of sodomy does not fit into Wade's narrative. During deliberations, at the jurors' request, the court provided the tape for them to hear again.

The jury convicted Taylor of two counts each of murder, kidnapping, and first-degree robbery, and one count of first-degree sodomy. The court sentenced him to death. The Kentucky Supreme Court affirmed the conviction on direct appeal, rejecting Taylor's 44 claims of error,[5] including a *Batson* claim (which the court rejected without comment) and a Confrontation Clause claim regarding Wade's confession. *Taylor v. Kentucky (Taylor I)*, 821 S.W.2d 72 (Ky. 1991). Taylor filed a Kentucky Rule 11.42 post-conviction motion that renewed the Confrontation Clause claim and raised an ineffective-assistance-of-counsel (IAC) claim, contending that, because trial counsel had failed to present evidence of the systemic

---

[5]The Kentucky Supreme Court remanded for resentencing on the kidnapping convictions.

exclusion of African-Americans from petit juries by the local prosecutor's office, he had failed to support a viable *Swain* claim.[6]  This prompted an evidentiary hearing and the production of evidence about the *Swain* claim.  The trial court denied the motion and the Kentucky Supreme Court affirmed.  *Taylor v. Kentucky (Taylor II)*, 63 S.W.3d 151 (Ky. 2001).[7]  The Kentucky Supreme Court next affirmed the trial court's denial of Taylor's Rule 60.02 and 10.02 motions on claims not relevant here, but *sua sponte* opined about the Confrontation Clause claim, holding that Wade's statement was harmless error even if a violation had occurred.  *Taylor v. Kentucky (Taylor III)*, 175 S.W.3d 68 (Ky. 2005).  And the Kentucky Supreme Court affirmed the trial court's denial of Taylor's K.R.S. § 422.285 motion for DNA testing, not relevant here.  *Taylor v. Kentucky (Taylor IV)*, 291 S.W.3d 692 (Ky. 2009).

On June 2, 2006, Taylor petitioned the district court for habeas relief pursuant to 28 U.S.C. § 2254, raising 54 claims of constitutional error.  The district court issued a thorough and meticulous 197-page opinion, analyzing and denying each of the claims.  *Taylor v. Simpson (Taylor V)*, No. 5:06-cv-00181, 2014 WL 4928925, at *1–2 (E.D. Ky. Sept. 30, 2014).  The district court granted Taylor a certificate of appealability (COA) as to (1) whether the trial court improperly admitted Wade's custodial statement in violation of *Crawford* and, if so, whether the

---

[6]Because Taylor had raised a *Batson* claim on direct appeal, Kentucky law prohibited him from raising that same claim again in post-conviction.  Therefore, Taylor did not initially raise a *Batson* claim in his Rule 11.42 motion.  Instead, he attempted to circumvent the prohibition by claiming ineffective assistance of trial counsel for failing to raise and satisfactorily support a *Swain* claim.  The Kentucky Supreme Court rejected it as improper.  Taylor did later amend his Rule 11.42 motion to reassert his *Batson* claim and the court denied it procedurally.  In his briefing on appeal to the Kentucky Supreme Court, however, Taylor insisted that he was *not* pursuing a *Batson* claim.  *See* Sixth Cir. Dkt. No. 42-6 at 9 (brief page 5) ("[The State] is again trying to litigate the *Batson* issue.  That issue was already resolved by this Court in the direct appeal.") (Taylor's RCr 11.42-appeal reply brief, filed Dec. 3, 1999).

[7]As will be addressed fully in Section III of this opinion, *infra*, the Kentucky Supreme Court denied Taylor's *Batson* claim in his direct appeal summarily.  *Taylor I*, 821 S.W.2d at 74.  That is, other than stating that it was "without merit," the *Taylor I* opinion gave no reason for its denial of Taylor's *Batson* claim.  *Id.*  That was nonetheless a final decision on the merits of Taylor's *Batson* claim.  No one disputes this.

In the subsequent appeal from Taylor's Rule 11.42 motion, the Kentucky Supreme Court denied Taylor's attempt to renew his *Batson* claim, holding that, because he had "alleged a *Batson* violation on direct appeal," where "[t]he issue was decided against [him]," it "c[ould] not be raised in his RCr 11.42 motion."  *Taylor II*, 63 S.W.3d at 157.  The *Taylor II* court further explained that, because *Batson* overruled *Swain* and applied retroactively, "*Batson*, not *Swain*, applies to Taylor's case."  *Id.* at 156.  Thus, *Taylor II* held that Taylor could not state a claim under *Swain*, as it did not apply, and could not renew his claim under *Batson*, as it was procedurally barred.  But the *Taylor II* opinion further opined that "[e]ven if we were to hold that *Swain* and not *Batson* w[ere] controlling, Taylor's claim would still fail for the same reason his *Batson* claim failed on direct appeal," namely that, because Taylor could not meet *Batson*'s standard, he could not meet *Swain*'s more rigorous standard.  *Id.* at 157.

error was harmless. *Id*. at 117. Subsequently, we granted a COA on two additional claims: (2) whether the prosecutor's use of peremptory strikes to exclude African-Americans from the jury was based on race in violation of *Batson*, and (3) whether defense counsel was ineffective in violation of *Strickland* for failing to introduce at trial sufficient evidence of the prosecution's historical pattern and practice of racially discriminatory jury selection in violation of *Swain*.

## II.

Because Taylor filed his petition in June 2006, we apply the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, *codified at* 28 U.S.C. § 2254, *et al.* Under AEDPA, the federal habeas court may overturn a state court conviction if the state court's last reasoned decision that adjudicated the challenged issue on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,] or [] resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

To prevail under the "contrary to" clause, a petitioner must show that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or that it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite" to that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). To prevail under the "unreasonable application" clause, a petitioner must show that "the state court identifie[d] the correct governing legal principle from th[e] Court's decisions but unreasonably applie[d] that principle to the facts of the [petitioner's] case." *Id*. at 413. For purposes of AEDPA, "clearly established [f]ederal law" refers only "to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quotation marks and citation omitted).**[8]**

---

**[8]**In his brief, Taylor constructs an argument in which, by his prevailing under AEDPA's "contrary to" or "unreasonable application" standards, AEDPA would cease to apply to his claims and, consequently, we would decide his claims de novo. *See*, *e.g.*, Apt. Br. at 31-32. Based on our analysis here, wherein Taylor does not prevail under AEDPA, we need not address Taylor's consequential argument.

Also, Taylor relies extensively on *Johnson v. California*, 545 U.S. 162 (2005), and slightly less so on *Miller El v. Dretke*, 545 U.S. 231 (2005), two *Batson*-issue cases decided years after the Kentucky Supreme Court

Because "an *unreasonable* application of federal law is different from an *incorrect* application of federal law," *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation marks omitted), "whether the trial judge was right or wrong is not the pertinent question under AEDPA," and, therefore, often times, "[i]t is not necessary . . . to decide whether the [state court]'s decision— or, for that matter, the trial judge's [decision]—was right or wrong," *id*. at 778 n. 3.    The pertinent question is whether the state-court decision applied clearly established federal law in an objectively unreasonable manner, *id.* at 773, such that its ultimate decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Because "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system," *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003), "AEDPA . . . imposes a highly deferential standard [on the federal courts] for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt," *Renico*, 559 U.S. at 773 (quotation marks and citations omitted).    Even in the case of a summary denial, when the state court has not fully explained the rationale for its decision, the reviewing "habeas court must determine what arguments or theories could have supported the state court's decision[] and then it must ask whether it is possible [that] fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision." *Cullen v. Pinholster*, 563 U.S. 170, 187-88 (2011) (editorial marks, quotation marks, and citation omitted).

Finally, when evaluating whether the application was unreasonable, the habeas court must consider the specificity of the governing precedent. *Harrington*, 562 U.S. at 101. "[T]he more general the [precedential] rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." *Renico*, 559 U.S. at 776 (editorial marks, quotation

---

decided his case.  In fact, in his reply brief, he is apoplectic that the State "failed to cite *Johnson* [] anywhere in its brief." Apt. Reply Br. at 4.  Presumably, this is based on his assertion of de novo review.  Regardless, these cases (and other recently decided cases that he cites) do not apply here, under AEDPA review, because they do not reflect governing Supreme Court precedent "as of the time of the relevant state-court decision." *See Lockyer*, 538 U.S. at 71.

marks, and citation omitted). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*, 562 U.S. at 101 (quotation marks and citation omitted).

And, as the Supreme Court has admonished: "If this standard is difficult to meet, that is because it was meant to be." *Id*. at 102. Indeed, AEDPA § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* (quotation marks and citation omitted).

**A.**

Taylor claims the Kentucky Supreme Court unreasonably applied *Batson v. Kentucky*, 476 U.S. 79 (1986), by holding that Taylor failed to establish a prima facie case (step one) and by ignoring that the prosecutor "admitted" his racist intent under step two. Thus, in his habeas petition, and here in this appeal, Taylor stresses his belief that "the prosecutor volunteered that he removed four black jurors for no other rational reason except that they were black," Apt. Br. at 28 (quotation marks omitted), and argues that this "requires automatic reversal." Apt. Br. at 15.

Taylor raised a *Batson* claim on direct appeal and the Kentucky Supreme Court denied it without explanation. *Taylor I*, 821 S.W.2d at 74 ("Allegations of error which we consider to be without merit will not be addressed here."). We must, therefore, "determine what arguments or theories could have supported" that decision. *See Cullen*, 563 U.S. at 188 (editorial marks omitted). Taylor attempted to reassert the claim in post-conviction proceedings, but the Kentucky Supreme Court rejected it as procedurally barred. *Taylor II*, 63 S.W.3d at 157 ("[Taylor] alleged a *Batson* violation on direct appeal. [It] was decided against Taylor on direct appeal and, therefore, cannot be raised in his RCr 11.42 motion."). The district court rejected this claim as well. *Taylor V*, 2014 WL 4928925, at *31-37.

At the time of Taylor's jury selection, in March 1986, *Swain v. Alabama*, 380 U.S. 202 (1965), was the controlling law about racial animus in peremptory challenges, but in April 1986,

the Supreme Court overruled *Swain* in *Batson*, and in 1987, the Court held in *Griffith v. Kentucky*, 479 U.S. 314 (1987), that *Batson* applied retroactively to cases still pending on direct review. Therefore, because Taylor's direct appeal was still pending, *Batson* and not *Swain* governed Taylor's appeal. The oddity, of course, is that *Batson* created an unprecedented[9] three-step framework for addressing this situation: Step 1—defense counsel makes a prima facie showing that the prosecutor struck jurors because of their race; Step 2—the prosecutor rebuts with a non-discriminatory reason; and, Step 3—the court decides whether defense counsel met the burden of proving that the prosecutor committed purposeful discrimination and, if so, corrects it before empaneling the jury. *Batson*, 476 U.S. at 96-99; *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991). But here, because this *Batson* three-step framework did not exist at the time of Taylor's jury selection, the parties and the trial court did not engage it, so the Kentucky Supreme Court had to assess all of it retrospectively, which necessitated certain assumptions and inferences.[10]

Before we proceed, it bears repeating and emphasizing that the question here is not whether the Kentucky Supreme Court's July 1991 retrospective application of *Batson* was right or wrong, *see Renico*, 559 U.S. at 773; the question is whether that particular application (and resulting decision) was so wrong that it was *objectively unreasonable*, meaning that it "was so lacking in justification that [the] error [was] well understood and comprehended in existing law [so as to be] beyond any possibility for fairminded disagreement," *see Harrington*, 562 U.S. at 103.

When Taylor raised his *Batson* claim to the Kentucky Supreme Court on direct appeal, his argument covered less than one page, comprising a mere four paragraphs and two footnotes:

---

[9]"The rule in *Batson v. Kentucky* is an explicit and substantial break with prior precedent." *Allen v. Hardy*, 478 U.S. 255, 258 (1986). "*Batson* not only overruled the evidentiary standard of *Swain*, it also announced a new standard that significantly changes the burden of proof imposed on both defendant and prosecutor." *Id.* at 260.

[10]Taylor did not argue to the Kentucky Supreme Court that it was obliged to, or even should, remand the *Batson* question to the trial court to decide in the first instance, rather than deciding it retrospectively on appeal. And Taylor is consistent in that he does not argue here that the Kentucky Supreme Court erred by failing to do so.

V.  Prosecution's Use of Peremptory Challenges to Strike 4 Black Jurors.

The issue was preserved by defense counsel's objection which was denied prior to the swearing of the jury.**29**

In *Batson v. Ky.*, 106 S.Ct. 1712 (1986), it was held that the Equal Protection Clause of the 14th Amend. precluded prosecutors from exercising peremptory challenges solely on the basis of race.  Such a practice also violates fair cross-section requirement of the 6th Amend.  *Booker v. Jabe*, 775 F.2d 762 (6th Cir. 1985).  The Commw.'s exercise of peremptory challenges violates §§2, 3 & 11 & the 6th & 14th Amends.

Being black, appellant [Taylor] is a member of a cognizable racial group. *Batson*, 106 S.Ct. at 1723.  The prosecutor directed 4 of his peremptory strikes toward black members of the jury panel**30** *and never offered any explanation* for the exercise of those peremptory challenges.

*Batson* is applicable to appellant [Taylor]'s case because it has not become final within the meaning of *Griffith v. Ky.*, 107 S.Ct. 708, 712 n.6 (1987); *Allen v. Hardy*, 106 S.Ct. at 2880 n.l.  Appellant [Taylor] has met the *Batson* test and is entitled to a new trial.

_____

**29**The defense exercised all 14 of its peremptory challenges and the Commw. used 8 of its 9.  Since the Commw struck 2/3 of the minority members of the prospective jury panel (i.e. 4 persons) and the defense peremptorily struck 1 black person, it can be concluded from the record that 1 black person was among 15 jurors who heard the evidence.

**30**Even one improperly exercised peremptory challenge entitles the accused to relief. *People v. Turner*, 726 P.2d 102, 112 (Cal. 1986); *U.S. v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986).

Sixth Cir. Dkt. No. 42-1 at 87 (Taylor's direct-appeal brief, filed Nov. 10, 1988) (record citations omitted; emphasis added).  Notice that Taylor did *not* point to the prosecutor's stammering statement at trial, with the phrase "no other rational reason," as a perceived "admission" of his racist intent.  To the contrary, Taylor said the prosecutor "never offered any explanation for the exercise of those peremptory challenges."  Therefore, even if we were to agree with Taylor's current speculation about the meaning of that statement, we could not conclude that the Kentucky Supreme Court acted unreasonably by failing to rely on it: that argument was not only never presented, it is the opposite of the argument that Taylor did present.  Clearly, on direct appeal to the Kentucky Supreme Court, Taylor's *Batson* claim relied exclusively on the prosecutor's use of eight peremptory challenges to strike four African-Americans from the

venire, leaving only two.  The State's opposing appellee brief was correspondingly pithy (five

paragraphs), arguing, in pertinent part:

> Only *after* the defendant establishes a prima facie case of purposeful
> discrimination must the prosecutor offer a neutral explanation.  [Taylor] does not
> point to any pattern or practice other than what occurred in his case.  He points to
> no instance in the record suggesting that any of the voir dire questions by the
> black prosecutor or by the black trial judge had any racial overtones.  Even
> though the burden is on him to do so, [Taylor] makes no attempt to prove a prima
> facie case of racial discrimination.
>
> The resolution of this issue in no way depends upon a mathematical
> formula.  For example, in *United States v. Montgomery*, 819 F.2d 847 (8th Cir.
> 1987) four blacks were available for selection as jurors.  The prosecutor removed
> two by peremptory challenge and the defendant removed another in this manner,
> leaving only one black on the panel.  The Eighth Circuit found no reason to infer
> from these circumstances that a *Batson* violation had occurred.[11]

Sixth Cir. Dkt. No. 42-2 at 68-69 (filed Nov. 13, 1989) (citation to *Batson* omitted; emphasis in

original).  So the State's argument was that, because Taylor had not established a prima facie

case (step one), the prosecutor was not obliged to offer any explanation for his strikes (step two),

so the State did not do so.  It is evident from the record, however, that the prosecutor could have

cited those individual jurors' education, employment, or views on capital punishment as reasons

for his strikes.  In his reply brief, Taylor's *Batson* argument had only two, albeit longer,

paragraphs:

> *Batson* [] can be violated by a black prosecutor.  *Batson* is concerned with
> the race of the prospective jurors and not with the race of the prosecutor or the
> judge.  Doubts as to whether a defendant has established a prima facie case under
> *Batson* must be resolved in his favor.  *State v. Slappy*, 522 So.2d 18, 22 (Fla.
> 1988).
>
> The [trial] [c]ourt agreed with the prosecutor that the exercise of the
> Commonwealth's peremptory challenges was completely unfettered.  However,
> even one improperly exercised peremptory challenge entitles the accused to relief.
> *Batson* [], *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986).  'All
> relevant circumstances' must be considered in determining 'whether the
> defendant has made the requisite showing'.  *Batson* [].  Here, a black defendant

---

[11]In fact, the Eight Circuit opined: "The fact that the government accepted a jury which included two
blacks, when it could have used its remaining peremptory challenges to strike these potential jurors, shows that the
government did not attempt to exclude all blacks, or as many blacks as it could, from the jury." *Montgomery*,
819 F.2d at 851 (citing *United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir. 1986) (per curiam)).

was accused of kidnapping, murdering and robbing two white juveniles and committing a sexual act against one of them; the community outrage forced the trial to be moved to a county nearly 90 miles away from where the crimes occurred; the publicity generated by the codefendant's trial; the public furor created by the verdict in that case; and 75 of the 119 persons called for jury service were excused because pretrial publicity caused them to formulate an opinion about [Taylor]'s guilt. These circumstances required the prosecutor to give reasons for exercising peremptory challenges against 4 black jurors.

Sixth Cir. Dkt. No. 42-3 at 19-20 (filed Jan. 29, 1990) (editorial marks, record citations, and citation to *Batson* omitted). Such was the *Batson* argument before the Kentucky Supreme Court.

As stated in *Batson*, 476 U.S. at 96, the defendant's step one prima facie showing requires the defendant to point to "facts and any other relevant circumstances" that "raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." The *Batson* Court elaborated on the prima facie requirement:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Id.* at 96-97. During Taylor's jury selection, nothing in the prosecutor's questions or commentary during voir dire, or while exercising his strikes, supports any inference of discrimination, nor has Taylor suggested as much. Even the prosecutor's "no other rational reason" statement came days later, during legal argument about Taylor's fair-cross-section claim. And, to reiterate, Taylor did not refer to that statement in his argument to the Kentucky Supreme Court. Rather, Taylor's only substantive accusation was that the prosecutor—in using eight of his allotted nine challenges—used half of those eight to strike four of the six African-Americans from the venire. The question for the Kentucky Supreme Court was whether that act, alone, was a pattern that necessarily gave rise to an inference of discrimination.

The question for us, however, is whether the Kentucky Supreme Court's means of answering, and resulting answer to, that question were not merely wrong, but so clearly wrong as to be objectively unreasonable. Because it denied Taylor's *Batson* claim, the court must have determined—based on the arguments before it—that the prosecutor's strikes of African-Americans from the venire did not display a pattern that "might give rise to an inference of discrimination" and, hence, did not show a prima facie case. *See Batson*, 476 U.S. at 96. Was that determination wrong "beyond any possibility for fairminded disagreement?" *See Harrington*, 562 U.S. at 103. Given the State's proffer of the contemporaneous holding in *Montgomery*, 819 F.2d at 851, which came out the same way and which Taylor did not refute, the answer is clearly "no."

Based on Taylor's limited argument to the Kentucky Supreme Court, the prosecutor's otherwise non-discriminatory conduct during voir dire and jury selection, and the absence of an indisputable pattern of discriminatory strikes in light of the cited *Montgomery* opinion, we cannot conclude that the Kentucky Supreme Court's denial of Taylor's *Batson* claim in *Taylor I* was necessarily contrary to or an unreasonable application of *Batson* or an unreasonable finding of fact.

We find no grounds to grant habeas relief on this issue.

**B.**

Taylor claims his trial counsel committed ineffective assistance (IAC) by failing to support the *Swain* claim. Taylor says that, while his trial counsel properly objected to the prosecutor's peremptory strikes of the African-American veniremen, the controlling law was *Swain v. Alabama*, 380 U.S. 202 (1965), and the objection "was deficient because at the time of trial, counsel did not support [the] objection with a wealth of available evidence regarding the [prosecutor's] office's pattern and practice of striking black jurors." Apt. Br. at 16; also 42, 45.

Taylor did not raise this IAC claim on direct appeal; he raised it in a post-conviction motion. The Kentucky Supreme Court rejected it on the merits because, even considering the evidence produced at the post-conviction hearing, Taylor "presented no evidence that this practice 'continued unabated' at his trial," meaning Taylor could not state a viable *Swain* claim,

so counsel was not deficient for failing to present background evidence. *Taylor II*, 63 S.W.3d at 157. The district court rejected this claim too. *Taylor V*, 2014 WL 4928925, at \*37-38.

To make out a prima facie case under *Swain*, "a defendant must show a pattern of racial discrimination in prior cases *as well as in his own*." *Ford v. Georgia*, 498 U.S. 411, 420 (1991) (emphasis added). The Kentucky Supreme Court stated this requirement somewhat differently, as requiring that Taylor present "evidence that this practice 'continued unabated' at his trial," *Taylor II*, 63 S.W.3d at 157 (citing an Eleventh Circuit case), but that construction is nonetheless a proper statement of the law, and certainly not an unreasonable application of the standard. Relying on this standard, the Kentucky Supreme Court concluded that Taylor had not produced evidence that would satisfy it because, at a minimum, Taylor had not shown racial discrimination in his own jury selection. That factual determination was not objectively unreasonable. Rather, it is fully consistent with, and supported by, its finding on the *Batson* claim discussed above.

All that is to say that, even if the background evidence that Taylor produced at the post-conviction evidentiary hearing had been presented at his trial, Taylor could not have prevailed on a *Swain* claim. Therefore, his trial counsel was not ineffective for failing to produce that evidence at trial. The Kentucky Supreme Court's ruling on this issue in *Taylor II* was neither contrary to nor an unreasonable application of *Strickland* or *Swain*.

We find no grounds to grant habeas relief on this issue.

## C.

Taylor claims that the Kentucky courts unreasonably applied the Sixth Amendment Confrontation Clause precedent by admitting his accomplice's unexamined confession. Taylor says the trial court violated his Sixth Amendment right to confront and cross-examine his accuser by playing Wade's recorded statement, and that *Taylor I*'s holding that it was admissible as a statement against interest was contrary to or an unreasonable application of *Lee v. Illinois*, among others; *Taylor II*'s holding that it was admissible based on other indicia of reliability was an unreasonable application of *Ohio v Roberts*; and *Taylor III*'s holding that any error was harmless was an unreasonable application of *Chapman v. California*. Apt. Br. at 17.

In the last reasoned state-court decision on this issue, the Kentucky Supreme Court held that *Crawford v. Washington*, 541 U.S. 36 (2004), was the applicable law but even if the ruling were in error, it would be harmless. *Taylor III*, 175 S.W.3d at 73-74. The district court considered all of the state-court rulings and Taylor's associated claims to conclude that this was not error under AEDPA and was harmless either way. *Taylor V*, 2014 WL 4928925, at *4-14.

Under *Chapman v. California*, 386 U.S. 18, 24 (1967), "before a federal constitutional error can be held harmless, the court must be" convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." But, as Taylor recognizes in his brief, Confrontation Clause claims in federal habeas proceedings apply the harmless-error rule of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and the factors of *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), which include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

Even if we accept that Wade's statement as a whole was important to the prosecutor's case,[12] all of the incriminating individual facts were both cumulative of and corroborated by other testimony and evidence, and the overall strength of the prosecutor's case was overwhelming. The district court recounted the prosecutor's evidence at length and concluded:

> In summary, there was more than ample evidence of Taylor's guilt without giving any consideration to Wade's statement. . . . Nothing contained in Wade's statement provides *additional* evidence to an element of the crimes that was not already contained in other evidence against Taylor. Thus, Wade's statement was corroborating, but it was not essential to Taylor's conviction. Therefore, if its admission was erroneous, it was harmless error under the *Brecht* standard.

---

[12]It is noteworthy that Wade made no reference whatsoever to Taylor's sodomizing one of the boys and that act of sodomy would not fit into Wade's narrative, but the jury nonetheless convicted Taylor of the sodomy charge. In this light, the presumptive importance of Wade's statement, at least from the jury's perspective, is debatable.

*Taylor V*, 2014 WL 4928925, at *14 (footnote omitted); *see also Taylor III*, 175 S.W.3d at 74 ("[W]ith or without [Wade's] statement, the proof that Taylor kidnapped, sodomized, and murdered the two boys was overwhelming and no jury could fail to find guilt beyond a reasonable doubt."). The record fully supports these factual determinations.

The Kentucky Supreme Court's ruling on this harmless-error issue in *Taylor III* was neither contrary to nor an unreasonable application of *Chapman*. And the district court's habeas ruling on this issue in *Taylor V* was a correct application of *Brecht* and *Van Arsdall*.

We find no grounds to grant habeas relief on this issue.

## III.

As already mentioned, in Taylor's direct appeal, the Kentucky Supreme Court summarily denied his *Batson* claim without explanation. *Taylor I*, 821 S.W.2d at 74. The *Taylor I* majority opinion was a mere four pages and provided an express analysis of only two of Taylor's 44 claims (i.e., "the admissibility of the Wade confession and the propriety of the trial judge's refusal to grant a second change of venue"), denying the other 42 with a catch-all statement: "We have carefully reviewed all of the issues presented by Taylor and . . . [a]llegations of error which we consider to be without merit will not be addressed here." *Id*. Thus, other than stating that it was "without merit," the *Taylor I* majority gave no reason for its denial of the *Batson* claim. That was nonetheless a final decision on the merits of Taylor's *Batson* claim. No one disputes this.

In Taylor's next appeal, which arose from the denial of his Kentucky Criminal Rule 11.42 motion, the Kentucky Supreme Court denied Taylor's attempt to renew his *Batson* claim, holding that he had "alleged a *Batson* violation on direct appeal [but] [t]he issue was decided against Taylor on direct appeal and, therefore, c[ould] not be raised in his RCr 11.42 motion." *Taylor II*, 63 S.W.3d at 157. The *Taylor II* court acknowledged that Taylor had actually brought this claim under *Swain* rather than *Batson*—surmising that he did so in an effort to circumvent the procedural prohibition, *id*.—but held that, because *Batson* overruled *Swain* and applied retroactively, "*Batson*, not *Swain*, applies to Taylor's case." *Id*. at 156. Thus, the *Taylor II* holding was that Taylor could not state a claim under *Swain*, as it did not apply, and could not

renew his claim under *Batson*, as it was procedurally barred.  But the *Taylor II* opinion did not stop there.  Instead, it opined that "[e]ven if we were to hold that *Swain* and not *Batson* w[ere] controlling, Taylor's claim would still fail for the same reason his *Batson* claim failed on direct appeal," and added a paragraph analyzing the *Batson* claim and concluding that, because Taylor could not meet *Batson*'s relaxed standard, he certainly could not meet *Swain*'s far more rigorous standard.  *Id*. at 157.  Quoted in full:

> Even if we were to hold that *Swain* and not *Batson* was controlling, Taylor's claim would still fail for the same reason his *Batson* claim failed on direct appeal.
>
> The evidence presented by Taylor at the [Rule 11.42] evidentiary hearing focused on the first part of his burden under *Swain*, i.e., whether the prosecutor's office had a systematic and intentional practice of excluding blacks from juries in criminal trials.  But he presented no evidence that this practice 'continued unabated' at his trial.  In addition to a prosecutor's exclusion of minority members from the venire via peremptory strikes, *Batson* also requires—to establish a prima facie case—a showing of 'other relevant circumstances' that create an inference that the prosecutor struck the jurors on the basis of their race. *Kentucky v. Hardy*, 775 S.W.2d 919, 920 (Ky. 1989).  In the case at bar, there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal.  Moreover, the trial court specifically noted that there was no evidence that African–Americans were systematically excluded from the venire.  Therefore, since a prima facie case was not made under *Batson*, it certainly was not made under the much more restrictive holding of *Swain*.

*Id*. (citation form corrected in the internal citation to *Hardy*).[13]

---

[13]Although Judge Griffin's dissent and, reciprocally, this section of this opinion, are focused on the *Batson*-specific sentences in this paragraph, we have not overlooked the sentence that says: "Moreover, the trial court specifically noted that there was no evidence that African–Americans were systematically excluded from the venire."

In its Rule 11.42-appeal briefing to the Kentucky Supreme Court, the State asserted that, "in his Notice of Death Sentence Review, page 9, Judge McAnulty, [the trial court judge for Taylor's trial,] who is African-American, noted that there was no evidence that members of [Taylor]'s race were systematically excluded from the jury." *See* Sixth Cir. Dkt. No. 42-5 at 49 (page 32) (Kentucky's RCr 11.42 appellee brief, filed Sept. 8, 1999); *see also* 42-5 at 59 (page 42 n.22) ("Appellant [Taylor]'s African-American trial judge refuted this claim in his Notice of Death Sentence Review, page 9, stating that there was no evidence of a systematic exclusion of minority jurors.").

Under Kentucky law, "[w]henever the death penalty is imposed for a capital offense, . . . [t]he circuit clerk . . . shall transmit the entire record and transcript to the [Kentucky] Supreme Court together with a notice prepared by the clerk and *a report prepared by the trial judge*. . . . The report shall be in the form of a standard questionnaire prepared and supplied by the [Kentucky] Supreme Court."  Ky. Rev. Stat. § 532.075(1) (emphasis added).  In 1986, at the time of Taylor's conviction, this "report" was a 12-page form titled "Notice of Death Sentence Review" that included two questions on page 9, under Section E "General Considerations," that are pertinent here:

In his dissent here, Judge Griffin has determined that this paragraph from *Taylor II* reveals the *Taylor I* majority's unstated analysis of Taylor's *Batson* claim in his direct appeal, and argues that, in deciding this § 2254 appeal, we should consider that passage as the Kentucky Supreme Court's last reasoned decision on the merits of Taylor's *Batson* issue, as if it were included in *Taylor I*. Although this approach has a certain appeal, particularly under the unique facts and circumstances of this case, and although Judge Griffin makes a compelling argument for it, there are several reasons we demur, both as a general matter and on the facts of this case.

**A.**

The passage from *Taylor II* is technically dicta. *See Richmond Health Facilities v. Nichols*, 811 F.3d 192, 201 n.8 (6th Cir. 2016) (quoting Black's Law Dictionary, 10th ed. 2014, for the definition of dicta). Obviously, it begins with the unmistakable language of dicta ("Even if we were to . . . ."), but, more importantly, it begins that way because the *Taylor II* opinion had already ruled on and rejected both the *Batson* and *Swain* claims, so the holding was complete and the added passage was legally unnecessary. And it is dicta about *Swain*, not *Batson*. The express purpose was to reject Taylor's *Swain* claim by way of the syllogistic short cut that: Taylor failed to prove "A" in *Taylor I*; "B" is greater than "A"; therefore, he cannot prove "B" here in *Taylor II*. Exactly *how* he failed to prove "A" in *Taylor I* does not affect the resulting legal determination.

Fundamentally, federal courts decide § 2254 petitions by comparing a state court judgment to Supreme Court precedent and, in doing so, we are to consider only the holdings and not the dicta on the precedent side of that comparison. *See White v. Woodall*, 572 U.S. 415, 419 (2014). It is therefore odd, and unprecedented so far as we can tell, that we would be obliged

---

4.  Were members of defendant's race represented on the jury? Yes [X] No [ ]

5.  If not, was there any evidence they were systematically excluded from the jury? Yes [ ] No [X]

In completing this form, Judge McAnulty answered as just noted: "Yes" to question 4 (one African-American sat on Taylor's jury) and "No" to question 5, thus submitting that there was no evidence that African-Americans were systematically excluded from Taylor's jury. Judge McAnulty signed the form on June 3, 1986, and submitted it to the Kentucky Supreme Court, albeit without comment from Taylor's counsel as was anticipated by the form.

On its face, this is an unambiguous statement by the trial court that, in its view, the prosecutor did not remove jurors from the venire based on race.

to—or that it would be proper for us to—consider dicta on the state-court-judgment side of the comparison.

Moreover, as we consider it here, this passage from *Taylor II* is not so much legal analysis as it is *evidence*, which could (theoretically) be proven or disproven.  That is, in asserting the reason (i.e., why and how) *Taylor I* denied the *Batson* claim, the *Taylor II* passage is an allegation that the *Taylor I* majority thought and acted in a certain way.  And, as evidence, it is of questionable legitimacy or, at least, its legitimacy was questioned by a dissenting justice, who wrote: "The majority opinion's assertion that Taylor's *Batson* claim was rejected on direct appeal because he failed to establish a prima facie case is pure speculation."  *Taylor II*, 63 S.W.3d at 171-72 (Stumbo, J., dissenting).[14]

Regardless, "the fact that a court is not bound by dicta does not mean that the dicta is incorrect."  *See Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 875 (6th Cir. 2017) (quotation marks and citations omitted).  It does, however, give rise to certain questions.  For example, suppose the *Taylor II* dissent had been more explicit in its renunciation of the *Taylor II* majority's dicta, and had offered a competing description of the *Taylor I* majority's probable analysis that was a perfect recitation of *Batson*.  How would we treat these competing versions of events?  Would such a dissent negate the majority's dicta; would we ignore the dissent and nonetheless accept the majority's dicta; would we choose between them based on a substantive evaluation?  Or suppose the *Taylor II* majority had stopped writing after denying the *Batson* and *Swain* claims procedurally, adding no dicta, and instead the paragraph describing *Taylor I*'s presumptive unstated analysis was included in only the *Taylor II* dissent—would we transplant the reasons from the *Taylor II* dissent in the same way as we would from the majority's dicta?

---

[14]It is virtually axiomatic that, pursuant to stare decisis, appellate courts speak with one voice, not as separate panels or individual judges, and we readily acknowledge as much here.  But given the novel idea before us—that a court's reasoning may be transplanted from one opinion into another—it is worth noting that the Kentucky Supreme Court decided *Taylor I* and *Taylor II* ten years apart (in 1991 and 2001, respectively), that only two of the seven justices who decided *Taylor I* were also on the court for *Taylor II*, and that the two opinions had different authors.  Therefore, while we accept, as we must, the legal fiction that a court is a monolithic entity, the reality is that these were separate opinions by two different groups of people, considering different issues, under different circumstances.

What if it had not been the opinion in *Taylor II* deciding the *Swain* and *Batson* claims, which are inherently related issues, but instead had been the *Taylor IV* opinion, denying the DNA testing, that inexplicably offered that paragraph of dicta about *Taylor I*'s presumptive unstated reasons? Would it still be appropriate to transplant that dicta into the *Taylor I* judgment for purposes of AEDPA analysis even though that dicta arose during the determination of an entirely unrelated issue? Or suppose that paragraph was not presented in a merits opinion but was instead included in a Kentucky Supreme Court order, such as an order deciding a motion to stay or a motion to extend time? Would we transplant language from a procedural order into the *Taylor I* holding? All of this is to question whether there are degrees or hierarchies of dicta that would correspond to different levels of reliability, such that we would rely on *this* dicta but not *that* dicta.

Alternatively, let's suppose the Kentucky Supreme Court had revealed the *Taylor I* reasons in an entirely separate case; that is, suppose that, in the hypothetical case of *Kentucky v. Criminal*, the court said, "we analyze a *Batson* claim just as we did in *Taylor I*, by . . . ," and then produced that exact same passage that is in *Taylor II*. Would we transplant that alleged reason and analysis into *Taylor I* for our AEDPA review? While *Taylor I* was pending before it,[15] the Kentucky Supreme Court issued *Kentucky v. Hardy*, 775 S.W.2d 919 (Ky. 1989),[16] a two-page majority opinion analyzing *Batson* that is indisputably more thorough, more detailed, and far more contemporaneous with *Taylor I* than is the single paragraph in *Taylor II*. Regardless of whether this *Hardy* analysis is correct or incorrect (contrary to or compliant with *Batson*, or a reasonable or unreasonable application of it), if it is appropriate to transplant a *Batson* analysis into *Taylor I* at all, would not this be a better source than *Taylor II*? And, for whatever it is worth, we will point out that the *Taylor II* passage's only legal citation is to *Hardy*. *See Taylor II*, 63 S.W.3d at 157.

---

[15]The Kentucky trial court entered final judgment and sentenced Taylor on May 23, 1986. Taylor filed his notice of appeal on June 2, 1986, filed his (first compliant) appellate brief on November 10, 1988, and filed his reply brief on January 29, 1990. The Kentucky Supreme Court issued *Taylor I* on September 6, 1990, and modified it on July 3, 1991. The Kentucky Supreme Court issued the case cited here, *Kentucky v. Hardy*, on September 7, 1989.

[16]The justice who authored this opinion also authored *Taylor I*, and five of the seven justices were the same.

Finally, considering the passage as a proffer of evidence and taking these hypotheticals to the extreme: suppose that, rather than opining in the *Taylor II* dicta, one of the Kentucky Supreme Court justices had, immediately after issuance of *Taylor I*, published a thoroughly documented law review article, made an emphatic campaign speech, or given a detailed media interview in which he or she explained the court's approach to its *Batson* analysis by reciting the language later used in *Taylor II* and exclaiming that the court had employed that exact approach in *Taylor I*.  Despite being extrajudicial, each of these sources would, at least arguably, be more reliable than dicta from *Taylor II*.  As a practical matter, would we be obligated to transplant the later-revealed reason or reasoning into *Taylor I* from a law review article, a political speech, or an interview?

Ordinarily, when reviewing a summary denial under AEDPA, we "determine what arguments or theories *could have supported* the state court's decision[] and . . . ask whether it is possible [that] fairminded jurists could disagree that *those arguments* or theories are inconsistent with the holding in a prior [Supreme Court] decision."  *Cullen*, 563 U.S. at 187-88 (quotation marks, editorial marks, and citations omitted; emphasis added).  We do not ordinarily transplant reasons or reasoning from elsewhere in the record, the caselaw, or the public forum.  To be sure, in *Wilson v. Sellers*, 584 U.S. --, 138 S. Ct. 1188, 1192 (2018), the Court told us to "look through" a silent opinion from the last reviewing state court to the reasoned opinion underlying it and "presume that the unexplained decision adopted the same reasoning."  The use of the words "reasoned opinion" and "reasoning" are noteworthy, as this approach presupposes a look through to a "holding," not dicta.  But the Court allowed that the presumption "may be overcome when there is reason to think some other explanation for the state court's decision is more likely," *id*. at 1195, "such as [when] alternative grounds . . . were briefed or argued to the state supreme court or obvious in the record it reviewed," *id.* at 1192.  Judge Griffin finds this look-through approach, or rather its caveat that we look to things otherwise "obvious in the record," sufficiently analogous to adopt it here.[17]  In fact, Judge Griffin finds this *Taylor II* dicta more

---

[17]A strict application of this approach here would have us "look through" *Taylor I* to the trial court, which hardly furthers Judge Griffin's theory inasmuch as the trial court did not conduct a *Batson* analysis (as *Batson* had not yet been created) and, therefore, provides no reasoning for adoption.  And, though we do not dwell on it, the trial court did elsewhere answer that African-Americans were not systematically excluded.  *See* fn. 13, *supra*.

convincing than an opinion from an intermediate appellate court, hence the foregoing protracted inquiry about the relative strength of various types of potential evidence of the reasoning behind a court's unexplained summary decision. But, to be fair, in our analysis in the previous section, we reviewed the briefing from Taylor's direct appeal to deduce the *Taylor I* majority's likely findings and conclusions.

Under the unusual circumstances of this case, it is both easy and tempting to accept the premise that the dicta from *Taylor II* reveals the *Taylor I* majority's unstated reasons, but that does not mean we should do so. But even if we should and we agree to transplant the *Taylor II* dicta into *Taylor I*, we would still find no *Batson* violation here that would warrant habeas relief.

**B.**

The *Taylor II Batson* analysis, considered in context, is not necessarily "contrary to" or "an unreasonable application of" *Batson* as it was understood when the Kentucky Supreme Court decided *Taylor I*. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011) (emphasizing that § 2254 "requires an examination of the state-court decision at the time it was made"). Before turning to the substance of the *Taylor II* passage, two points bear reemphasizing. One, though it begins with the assertion that "Taylor's [*Swain*] claim would still fail for the same reason his *Batson* claim failed on direct appeal," *Taylor II*, 63 S.W.3d at 157, the passage does not claim, at least not expressly, to be recollecting, revealing, or recreating the *Taylor I* majority's thoughts or actions. Rather, it appears to be a de novo *Batson* analysis conducted by the *Taylor II* majority.[18] And, two, despite being—or appearing to be—a de novo *Batson* analysis conducted in 2001, we treat it as if it were the *Taylor I* majority's *Batson* analysis conducted in 1991 (i.e., as if it were in the *Taylor I* opinion) because *Taylor I* is the final judgment we are to review under AEDPA. Therefore, for purposes of this exercise, we will assume that the *Taylor II* passage accurately recollects the *Taylor I* majority's analysis of Taylor's *Batson* claim in 1991. The pertinent passage says:

---

[18]The *Taylor II* dissent labeled it "pure speculation." *Taylor II*, 63 S.W.3d at 171-72 (Stumbo, J., dissenting).

In addition to [1] a prosecutor's exclusion of minority members from the venire via peremptory strikes, *Batson* <u>*also requires*</u>—to establish a prima facie case—[2] a showing of 'other relevant circumstances' that create an inference that the prosecutor struck the jurors on the basis of their race. In the case at bar, there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal. Moreover, the trial court specifically noted that there was no evidence that African-Americans were systematically excluded from the venire. Therefore, [] a prima facie case was not made under *Batson*. . . .

*Id*. (citation to *Hardy* omitted; emphasis added). Compare that with *Batson* itself, which sets out a three-step process for stating the prima facie case, though only two of them are pertinent here:

To establish such a case, the defendant first must show [1] that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race[,] . . . . [and] [2] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury . . . raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96-97 (quotation marks and citations omitted).

Judge Griffin's view is that *Taylor II* violates AEDPA because the passage is "contrary to" *Batson*: i.e., whereas *Batson* requires only that the petitioner (defendant) raise an inference of purposeful discrimination based on *all* relevant circumstances, the *Taylor II* passage improperly requires that the petitioner show (1) that the prosecutor struck jurors of the defendant's race *and* "other relevant circumstances," such that "the failure to prove 'other relevant circumstances' [is] a per se failure to establish a prima facie case." Dis. Op. [¶20], *infra*. But, as is evident from the *Batson* passage above, the *Taylor II* passage, taken as written, is satisfactorily (if not perfectly) consistent with *Batson*.

Based on Judge Griffin's further explanation, however, he interprets the first requirement as more than merely a prosecutor's striking a juror or jurors of the petitioner's race, which is the obvious and ordinary trigger to a *Batson* scenario; rather, he interprets the first requirement as a "'pattern' of strikes against black jurors" that "might give rise to an inference of discrimination." Dis. Op. [¶19], *infra* (quoting *Batson*, 476 U.S. at 96-97).[19] In that light, *Taylor II* is contrary to *Batson* because it requires "other" evidence *beyond a pattern of strikes*, whereas *Batson* explicitly contemplated a scenario where a pattern of strikes alone would suffice. *See Batson*, 476 U.S. at 97 ("For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."). That is, Judge Griffin interprets the *Taylor II* passage as holding that a pattern of strikes alone is per se insufficient to state a prima facie case.

As already suggested, Judge Griffin's interpretation is not a plain or inevitable reading of the *Taylor II* passage; it requires certain assumptions, not the least of which is that any striking of jurors of the petitioner's race is necessarily and always a "pattern" that gives rise to an inference of discrimination, such that a court would not look for or find such a "pattern" as part of the "other" considerations in the second prong, but exclusively in the first prong. But even if it were true that any strikes at all necessarily show a pattern—though we do not agree that it is true—*Batson* was clear that a pattern alone is not determinative: "a 'pattern' . . . *might* give rise to an inference of discrimination." *Batson*, 476 U.S. at 97 (emphasis added). It is possible that a pattern *might not* give rise to an inference of discrimination, and a court could adhere to *Batson* in so finding.

We must be mindful that, "[w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). The petitioner must show that "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in

---

[19]To be clear, we do not understand Judge Griffin to mean that a petitioner could make out a prima facie *Batson* case merely by satisfying the first requirement of the test: showing only that the prosecutor struck jurors of the defendant's race. Neither *Batson* nor any other court has ever held such a thing.

existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. So, the question would be whether the *Taylor II* passage, as written and as reasonably understood in 1991 (at the time of *Taylor I*), was contrary to *Batson* beyond any possibility for fair minded disagreement.

We must conclude that it was not. By its plain terms, the *Taylor II* passage presents a reasonable recitation of *Batson*. And, at the time, federal courts of appeals were setting forth and applying *Batson* similarly. Most notably, in *Montgomery*, 819 F.2d at 850-51, the case the prosecution proffered to the *Taylor I* court in its briefing on direct appeal, the Eighth Circuit set out and applied *Batson* this same way. *See* § II.A & fn.11, *supra*. *See also*, *e.g.*, *United States v. Clemmons*, 892 F.2d 1153, 1155 (3d Cir. 1989) ("To make [a prima facie] case, the defendant must demonstrate that he and the prospective juror are members of the same 'cognizable group.' *Additionally*, the defendant must point to circumstances surrounding the peremptory challenges—including any unusual pattern of strikes or other suggestive comments or acts by prosecutors—that 'give rise to an inference of discrimination.'" (citation omitted, emphasis added)); *United States v. Bishop*, 914 F.2d 249 (table), 1990 WL 130475, at *3 (4th Cir. 1990) ("We are inclined to agree with the government that [the defendants] failed to establish [an inference of racial discrimination under] the *Batson* test because they asserted nothing more than that the stricken juror was black."); *cf. United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521 (6th Cir. 1988) ("We reject [the defendants]'s underlying premise that an inference of intentional discrimination will *always* arise if, without more, there is a showing that the prosecution used all its peremptory challenges to exclude blacks." (emphasis in original)); *United States v. Grandison*, 885 F.2d 143, 148 (4th Cir. 1989) ("[The defendants] contend that statistical analysis supports an inference of purposeful discrimination. . . . Such statistical comparisons are, however, a poor way to resolve a *Batson* challenge."). The statement in *Taylor II* would have found support in the precedent at the time of *Taylor I*, and could not therefore surpass fair minded disagreement.

Thus, assuming it would be appropriate to transplant the passage from *Taylor II* into *Taylor I*, *Taylor I* would still not violate AEDPA.

**IV.**

For the foregoing reasons, we AFFIRM the judgment of the district court.

—————————

## DISSENT

—————————

GRIFFIN, Circuit Judge, dissenting.

This case is *Batson v. Kentucky* revisited.

In the mid-1980s, a jury in Jefferson County, Kentucky convicted an African American man of multiple criminal charges. During jury selection, the prosecutor unconstitutionally used his peremptory challenges to strike four African Americans from the venire. The defendant's attorney unsuccessfully objected to the race-based nature of the strikes. These are the facts of *Batson v. Kentucky*, 476 U.S. 79, 82–83 (1986); they are also the facts of this case. But while the Supreme Court promptly reversed James Batson's conviction, petitioner Victor Taylor has spent the last thirty-four years on death row.

The Kentucky Supreme Court had an opportunity to provide Taylor with the remedy *Batson* requires. But instead of doing so, it misapplied *Batson* by reading an additional requirement into the burden for establishing a prima facie case of race discrimination and then concluding that Taylor failed to satisfy it. This was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In my view, Taylor established a prima facie case of purposeful race discrimination in the selection of his jury. And because the prosecutor failed "to come forward with a neutral explanation for challenging black jurors," *Batson* mandates that we grant habeas relief. 476 U.S. at 97, 100. I would reverse the district court's denial of Taylor's § 2254 petition and therefore respectfully dissent.[1]

I.

I begin with an antecedent question: Which decision(s) of the Kentucky Supreme Court are we reviewing? The majority reviews solely the 1991 decision affirming Taylor's convictions on direct appeal, *Taylor v. Commonwealth (Taylor I)*, 821 S.W.2d 72 (Ky. 1991). Taylor raised

---

[1]I join the majority opinion's resolution of petitioner's Confrontation Clause claim (Section II.C).

his *Batson* claim then, but the court did not address it with particularity. Instead, it merely stated that "Taylor, through counsel, raises forty-four assignments of alleged error in this appeal. We have carefully reviewed all of the issues presented by Taylor. . . . Allegations of error which we consider to be without merit will not be addressed here." *Id.* at 74. I agree with my colleagues that this decision constitutes a merits adjudication of Taylor's *Batson* claim for purposes of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). *See Harrington v. Richter*, 562 U.S. 86, 99–100 (2011).

The problem with my colleagues' analysis, however, is that the Kentucky Supreme Court explicitly addressed the merits of Taylor's *Batson* claim in a later opinion: *Taylor v. Commonwealth (Taylor II)*, 63 S.W.3d 151 (Ky. 2001). *Taylor II* reviewed a denial of a motion for postconviction relief pursuant to Kentucky Rule of Criminal Procedure 11.42. In that proceeding, Taylor asserted a claim under *Swain v. Alabama*, 380 U.S. 202 (1965), which was the Supreme Court's applicable standard for challenging juror strikes on the basis of race at the time of his trial.[2] *Taylor II*, 63 S.W.3d at 156. Because Taylor raised a *Batson* claim in his direct appeal (*Taylor I*), the Kentucky Supreme Court affirmed the denial of his Rule 11.42 motion regarding his new *Swain* claim, concluding that it was simply "an attempt to get around [the] long-established rule" that a Rule 11.42 motion may not be utilized to "permit a convicted defendant to retry issues which . . . were raised in the trial court and upon an appeal considered by this court." *Id.* at 157 (citation omitted).

The Kentucky Supreme Court could have stopped there. But it did not. Instead, the court addressed the merits of both the *Swain* and *Batson* claims raised by Taylor:

> The evidence presented by Taylor at the evidentiary hearing focused on the first part of his burden under *Swain, i.e.*, whether the prosecutor's office had a systematic and intentional practice of excluding blacks from juries in criminal trials. But he presented no evidence that this practice "continued unabated" at his trial. In addition to a prosecutor's exclusion of minority members from the venire via peremptory strikes, *Batson* also requires—to establish a prima facie case—a

---

[2]In *Batson*, the Supreme Court overruled *Swain*. *See Batson*, 476 U.S. at 100 (White, J., concurring). Although *Swain* was in effect at the time of Taylor's trial, because *Batson* was issued before Taylor's direct appeal was decided, *Batson* applies to Taylor's case. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987); *see also id.* at 316–17, 327 (discussing Griffith's 1984 trial in Jefferson County, Kentucky where "[t]he prosecution used four of its five allotted challenges to strike four of the five prospective black jurors").

showing of "other relevant circumstances" that create an inference that the prosecutor struck the jurors on the basis of their race. In the case at bar, there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal. Moreover, the trial court specifically noted that there was no evidence that African-Americans were systematically excluded from the venire. Therefore, since a prima facie case was not made under *Batson*, it certainly was not made under the much more restrictive holding of *Swain*.

*Id.* (citations omitted). My colleagues conclude that *Taylor II* is solely a procedural dismissal of Taylor's *Batson* claim. I respectfully disagree.

In my view, *Taylor II* specifically addressed and explained the "reason [Taylor's] *Batson* claim failed *on direct appeal*."[3] *Id.* (emphasis added). The Commonwealth agrees, writing in its brief in defense of the present appeal that "[i]n the process of denying the [*Swain*] claim, the Court also reiterated that the original *Batson* claim was denied on direct appeal because no *prima facie* case had been shown (as would have been the case in a more onerous *Swain* claim)." So too did one of the dissenting Justices in *Taylor II*. *Id.* at 171–72 (Stumbo, J., dissenting). Accordingly, *Taylor II*'s unambiguous language clarifies the scope of our review here. We must review the Kentucky Supreme Court's merits adjudication of Taylor's *Batson* claim in *Taylor I* and, as a part of that adjudication, its explanation in *Taylor II* specifying why it rejected the claim.

I acknowledge that this procedure is unusual, but we often engage in similar exercises. For example, consider our practice when a state court of last resort denies a petitioner's federal claim on the merits without explanation with a simple "affirmed" or "denied." *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). On habeas review, we do not immediately proceed to "determin[ing] what arguments or theories . . . could have supported[ ] the state court's decision." *Richter*, 562 U.S. at 102. Instead, a federal court should "'look through' the unexplained decision to the last related state-court decision that does provide a relevant

---

[3]This distinguishes the Kentucky Supreme Court's discussion of the *Batson* claim in *Taylor II* from the sort of "alternative holdings" that are insulated from federal court review by the adequate and independent state ground doctrine. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

rationale"—often, a decision by the state intermediate appellate court. *Wilson*, 138 S. Ct. at 1192. "It should then presume that the unexplained decision adopted the same reasoning."[4] *Id.*

As discussed above, *Taylor I* rejected Taylor's *Batson* claim without explanation. In Kentucky, death penalty appeals are filed directly with the state supreme court, *see* Ky. R. Civ. P. 74.02(2), so we do not have an intermediate appellate court's decision to look to. Instead, we have a subsequent opinion from the *same* court articulating why it rejected Taylor's *Batson* claim. In my view, this explanation must be considered and not ignored. Kentucky's highest court issued both opinions and its latter opinion contains the "relevant rationale" for its earlier, unexplained decision rejecting Taylor's *Batson* claim. *Wilson*, 138 S. Ct. at 1192.

In sum, we need only take the Kentucky Supreme Court at its word. We should not "presume" anything or speculate regarding what rationale "could" have supported its decision. *Id.* Because *Taylor II* is the "last related . . . decision" of the Kentucky Supreme Court in this case and provides us with its rationale for rejecting Taylor's *Batson* claim, we must review it for AEDPA purposes. *Id.* Thus, the majority's reliance on *Richter*'s "could have supported" approach is misplaced.[5] *See* 562 U.S. at 102.

## II.

I now address whether the Kentucky Supreme Court's decisions in this case are "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). I would hold that they are.

---

[4]Outside of the habeas context, consider too a district court's denial of a motion for reconsideration. Oftentimes, the court will deny the motion and "affirm[ ] and elaborate[ ] upon its [original] order." *Rosen v. Goetz*, 129 F. App'x 167, 169 (6th Cir. 2005) (per curiam). On appeal, the court of appeals may consider the district court's discussions of the merits in both orders, even though the court denied the motion for reconsideration. *Id.*; *see United States v. Amaya*, 750 F.3d 721, 725 (8th Cir. 2014); *United States v. Milo*, 506 F.3d 71, 73 (1st Cir. 2007).

[5]The majority opinion responds to this analysis with numerous rhetorical questions raising hypotheticals that do not reflect the circumstances of this case. My approach is entirely consistent with *Wilson*'s directive to "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." 138 S. Ct. at 1192.

A.

Taylor argues that the Kentucky Supreme Court applied the wrong standard in determining whether he made an adequate prima facie showing of discrimination under *Batson*. To establish a prima facie case, a defendant need only "raise an inference that the prosecutor . . . exclude[d] the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96. This requires three showings. First, a defendant "must show that he is a member of a cognizable racial group." *Id.* Second, he must show "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* Here, all agree that Taylor is African American and that he challenged the prosecutor's removal of four African Americans from the venire.

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). But as a practical matter, it is unlikely that a defendant will establish a prima facie case if the only evidence he presents is the prosecutor's strike of a single venireman of the same race.[6] *See Paulino v. Castro*, 371 F.3d 1083, 1091–92 (9th Cir. 2004). A defendant typically must show something more. "For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97. This has been a common method of satisfying the prima facie burden in the years since *Batson* issued. *See, e.g.*, *Davis v. Ayala*, 576 U.S. 257, 260–61 (2015) (Ayala "made a prima facie Batson showing" where the prosecutor "used seven peremptories to strike all of the African-Americans and Hispanics who were available for service"); *see also Foster*, 136 S. Ct. at 1747 (parties agreed Foster established a prima facie case where the prosecutor struck all four African American jurors who qualified to serve); *Miller-El v. Cockrell*, 537 U.S. 322, 326, 338 (2003) (parties agreed Miller-El established a prima facie case where prosecutors

---

[6]In recent years, "the [Supreme] Court has extended *Batson* in certain ways." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) ("A defendant of any race may raise a *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races."). But for our purposes here, we need only focus on the holding of *Batson* itself.

had "used peremptory strikes to exclude 10 of the 11 African-Americans eligible to serve on the jury"). "Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97. In *Batson*, the Supreme Court emphasized that "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Id.* at 96.

In *Taylor II*, the Kentucky Supreme Court correctly recited the first two elements of the prima facie burden under *Batson*, but then stated that "*Batson* also requires—to establish a prima facie case—a showing of 'other relevant circumstances' that create an inference that the prosecutor struck the jurors on the basis of their race." 63 S.W.3d at 157 (citation omitted). Applying that rule, the court held that because "there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal," Taylor's claim failed. *Id.*

Here the Kentucky Supreme Court misstated the law. *Batson* does not categorically require that a defendant show "other relevant circumstances" beyond the defendant's race and the prosecution's striking of prospective jurors of the same race. First, the plain language of the Supreme Court's recitation of the standard makes this clear: a petitioner must show that "these facts [that is, the first two elements] *and* any other relevant circumstances" establish a prima facie case of discrimination. *Batson*, 476 U.S. at 96 (emphasis added). Second, immediately after laying out the standard, the Court elaborated thus: "In deciding whether the defendant has made the requisite showing, the trial court should consider *all* relevant circumstances," thus highlighting the holistic nature of the analysis. *Id.* (emphasis added). Third, the Court gave an example of a situation in which "other relevant circumstances" would *not* be required to satisfy the prima facie burden: "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."**[7]** *Id.* at 96–97 (emphasis added).

---

**[7]**The Supreme Court reiterated this point in a later case, which issued before Taylor's direct appeal was decided: "In *Batson*, we held that determining whether a prima facie case has been established requires consideration of all relevant circumstances, including whether there has been a pattern of strikes against members of a particular race." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991) (citing *Batson*, 476 U.S., at 96–97).

After all, a "pattern" of strikes may simply mean that the prosecutor struck multiple African American prospective jurors—more instances of the second element being satisfied. *See* Pattern, *Merriam-Webster Online Dictionary* (last visited Aug. 18, 2020), https://www.merriam-webster.com/dictionary/pattern ("a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution"). In some instances, a pattern of strikes will be sufficient to satisfy the third element, and in others, it will not. *Compare Ayala*, 576 U.S. at 260–61 (2015) (Ayala "made a prima facie *Batson* showing" where prosecutor "used seven peremptories to strike all of the African-Americans and Hispanics who were available for service"), *with United States v. Bishop*, 914 F.2d 249, 1990 WL 130475, at *3 (4th Cir. 1990) (per curiam) (table) (defendants "failed to establish the third element of the *Batson* test because they asserted nothing more than that [one] stricken juror was black").

In light of the Supreme Court's clear language, I cannot accept a reading of *Batson* that treats the failure to prove "other relevant circumstances" as a per se failure to establish a prima facie case. By segmenting the third prima facie element into two necessary showings, the Kentucky Supreme Court improperly heightened the standard under *Batson*.

### B.

Not every error by a state court satisfies AEDPA's highly deferential standard, of course. "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e Supreme] Court; or that it 'involved an unreasonable application of' such law; or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court."[8] *Richter*, 562 U.S. at 100 (citations omitted). At issue here is the "contrary to" clause, which (the Supreme Court has made clear) has an "independent meaning" from the "unreasonable application" clause. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

---

[8]"A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010). Here, no one disputes that the burden for establishing a prima facie case of race discrimination in the jury selection process was "clearly established" in *Batson*'s holding before the Kentucky Supreme Court decided Taylor's direct appeal.

*Williams v. Taylor* explained the meaning of this provision. *Id.* at 405–06 (O'Connor, J., delivering the opinion of the court on the meaning of the "contrary to" clause). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Id.* at 405 (citation omitted). Thus, "[a] state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases."[9] *Id.* Consider the following example from *Williams*:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to [the Supreme Court's] clearly established precedent because [it] held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

*Id.* at 405–06 (citation omitted). In this scenario, "a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause." *Id.* at 406.

Indeed, in *Williams* itself, the Court held that the Virginia Supreme Court's decision rejecting a claim of ineffective assistance of counsel was "contrary to" Supreme Court precedent because the court applied the heightened standard found in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), on top of the rule in *Strickland v. Washington*, 466 U.S. 668 (1984), when it should have applied only the latter. 529 U.S. at 397; *see also Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006) ("In conflating *Lockhart*'s heightened prejudice standard with *Strickland*'s prejudice analysis, the state court decision is 'contrary to' clearly established federal law."). The Supreme Court has thus made clear that § 2254(d)(1)'s "contrary to" clause is satisfied where a state court "sets forth the wrong legal framework," *Goodman*, 467 F.3d at 1028 (citation omitted), in a way that heightens the petitioner's burden beyond what the law requires. *See also*

---

[9]"[A] state-court decision is also contrary to [Supreme Court] precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite conclusion. *Williams*, 529 U.S. at 405.

*Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (rejecting a heightened-relevance standard applied by the Fifth Circuit that "has no foundation in the decisions of this Court").

That is exactly what happened here. The Kentucky Supreme Court misread the third element of a prima facie case under *Batson* in a way that made Taylor's burden more difficult to satisfy.

C.

My colleagues respond by arguing that *Taylor II* nevertheless "presents a reasonable recitation of *Batson*." They highlight other decisions from the time period *Taylor II* was decided and assert that other courts interpreted and applied the prima facie burden similarly to the Kentucky Supreme Court. But in doing so, they overlook a crucial difference between those cases and *Taylor II*.

A competing interpretation from that time was that a pattern of strikes qualifies as one of the "other relevant circumstances" required to satisfy the third element of the prima facie burden. That is, the strikes in and of themselves satisfy the second element, and the fact that multiple strikes exist—giving rise to a "pattern" of strikes—is considered at the third element. In *United States v. Montgomery*, for example, the Eighth Circuit stated that "[t]o establish [a prima facie] case, the defendant must show, among other things, that the government's use of its peremptory challenges and any other relevant circumstances raise an inference that the government excluded prospective jurors on the basis of their race." 819 F.2d 847, 850–51 (8th Cir. 1987). The court then discussed and rejected the petitioner's pattern-of-strikes argument as unconvincing. *Id.* (prosecution used two of its six strikes to eliminate two of the four African American members of the venire). Other cases cited by the majority formulated the standard similarly. *Bishop*, 1990 WL 130475, at *3 ("In evaluating whether a defendant has made a prima facie case, the trial judge should consider all relevant circumstances, such as a pattern of strikes against blacks in a particular venire, or the type of questions and statements a prosecutor uses in voir dire."); *United States v. Clemmons*, 892 F.2d 1153, 1155 (3d Cir. 1989) ("Additionally, the defendant must point to circumstances surrounding the peremptory challenges—including any unusual pattern of

strikes or other suggestive comments or acts by prosecutors—that give rise to an inference of discrimination." (citation and internal quotation marks omitted)).**10**

In my view, the interpretation of the prima facie burden from *Montgomery*, *Bishop*, and *Clemmons* is not "contrary to" *Batson*'s holding.  (It does not improperly heighten the defendant's burden beyond what the law requires, and merely switches the order of the prima facie analysis.)  But it is not the same reading that the Kentucky Supreme Court adopted in *Taylor II*.  Critically, nothing about the other Circuits' discussions of *Batson*'s prima facie burden indicates that a failure to show "other relevant circumstances" *beyond* a pattern of strikes against African American jurors would constitute a per se failure to establish a prima facie case. In other words, it makes little difference at which element of the prima facie test a court may consider a pattern-of-strikes argument—but it makes a world of difference if a pattern-of-strikes argument is *always* insufficient to satisfy the third element.

How do we know that the Kentucky Supreme Court interpreted *Batson*'s prima facie burden as requiring more than a pattern-of-strikes argument at the third element?  It is the only reasonable way to make sense of the court's discussion.  Recall the court's statement that "there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal."  *Taylor II*, 63 S.W.3d at 157.  If a pattern of strikes qualifies as an "other relevant circumstance[ ]," then this statement is objectively false.  During jury selection, Taylor's counsel argued that the prosecutor had engaged in a pattern of striking African American prospective jurors.  Defense counsel (Mr. Jewell) and the prosecutor (Mr. Jasmin) had the following back-and-forth discussion during that objection:

> [MR. JEWELL:]     It is noted that the Commonwealth used, I believe, half of their strikes to exclude two-thirds of the minority members left on the panel.  We would object to the seating of this jury.

---

**10**The majority's remaining cases merely stood for the uncontroversial proposition that a pattern of strikes is one of many considerations that a court must evaluate and rejected the petitioners' arguments advocating automatic-violation rules.  *See United States v. Grandison*, 885 F.2d 143, 148 (4th Cir. 1989); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521 (6th Cir. 1988).

MR. JASMIN:        You say I used two-thirds of my strikes to strike minorities?

MR. JEWELL:        Half of your strikes to exclude two-thirds of minority members on the panel.

MR. JASMIN:        Half, meaning four and a half?

MR. JEWELL:        You used four--You used eight, I believe, correct?

MR. JASMIN:        That's correct.

MR. JEWELL:        Okay.   And four of them were directed at minority members.

MR. JASMIN:        And, for the record, the Commonwealth would note defense also struck at least one or two black folk.

MR. JEWELL:        The defense struck one minority member.

MR. JASMIN:        In accordance with case law, the Commonwealth has no other rational reason—if I strike all it then becomes objectionable under the cases from, as I understand it, coming from California.

Taylor also raised his pattern-of-strikes argument on direct appeal, emphasizing three things of note here: (1) "[t]he prosecutor directed 4 of his peremptory strikes toward black members of the jury panel"; (2) the prosecutor "struck 2/3 of the minority members of the prospective jury panel (i.e. 4 persons)"; and (3) the prosecutor "never offered any explanation for the exercise of those peremptory challenges."   Thus, when the Kentucky Supreme Court stated that Taylor had not provided any "other relevant circumstances" at the time the jury was seated or on direct appeal, it could not have thought a pattern of strikes qualifies as such.[11]

None of the cases cited by the majority stand for the proposition that a pattern-of-strikes argument is per se insufficient to meet the third element of *Batson*'s prima facie burden.   Nor would one expect them to, as the Supreme Court made clear in *Batson* that, in at least some

---

[11]Even if we assume that the Kentucky Supreme Court did interpret *Batson*'s prima facie burden in a manner consistent with *Montgomery*, *Bishop*, and *Clemmons*, then its decision would not deserve AEDPA deference for a different reason:  it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2).  A denial of relief because a defendant failed to make an argument, when he did in fact make that argument—at two different stages of the state-court proceedings, no less—is not the sort of issue on which "reasonable minds reviewing the record might disagree."  *Wood v. Allen*, 558 U.S. 290, 301 (2010) (brackets and citation omitted).  The arguments are there on the page, plain as day.

scenarios, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." 476 U.S. at 97. *Taylor II* thus stands alone.

Because *Taylor II* misread *Batson* by heightening the standard for establishing a prima facie case, I would hold that it is "contrary to" clearly established Supreme Court precedent. § 2254(d)(1).

### III.

"[U]nconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause," *Williams*, 529 U.S. at 406, I review Taylor's *Batson* claim "without the deference AEDPA otherwise requires," *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Relief depends on Taylor demonstrating that he remains "in custody in violation of the Constitution . . . of the United States." § 2254(a); *Magana v. Hofbauer*, 263 F.3d 542, 551 (6th Cir. 2001). Having done so, I conclude Taylor has demonstrated a clear *Batson* violation and is entitled to conditional habeas relief.

### A.

"[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). "[T]he Supreme Court has not provided a particularized view of what constitutes a prima facie showing of discrimination under *Batson*." *Carmichael v. Chappius*, 848 F.3d 536, 545 (2d Cir. 2017) (citation and internal quotation marks omitted). But it has provided some examples. *See Johnson v. California*, 545 U.S. 162, 170 (2005) (use of three peremptory challenges (out of twelve) to remove all three African American prospective jurors); *Miller-El*, 537 U.S. at 342 (exclusion of 91% of the eligible African American prospective jurors).

Recall here that thirty-eight qualified prospective jurors remained when the trial court authorized counsel to exercise peremptory strikes. Six of those thirty-eight were African American, comprising 16%. The prosecutor used half of his peremptory strikes to remove four of those six African American jurors—a 67% exclusion rate. The numbers here do not rise to the

same level condemned by the Supreme Court in *Johnson* and *Miller-El*, but they do not clearly fail to "raise an inference" of discrimination, either.

In this regard, *United States v. Alvarado* is instructive. 923 F.2d 253 (2d Cir. 1991). There the Second Circuit held that a defendant successfully established a prima facie case under *Batson* when he shows a significant statistical disparity between the prosecution's minority exclusion rate and the overall minority composition of the venire. *Id.* at 255. "[An exclusion] rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under *Batson*." *Id.* The court found a prima facie case had been established where the prosecution excluded half of the prospective African American and Hispanic jurors. *Id.* The statistical disparity here exceeds that in *Alvarado*. If the prosecutor had in fact exercised his peremptory strikes on a race-neutral basis, one would expect the exclusion rate to roughly match the rate of qualified African American jurors. But the exclusion rate exceeded the rate of African American jurors by a factor of *four*: the prosecutor struck 67% of African American jurors who comprised only 16% of the remaining venire.

The disparity here is more than enough to raise an eyebrow; it would "permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. This conclusion is consistent with our decision in *Drain v. Woods*, 595 F. App'x 558, 571 (6th Cir. 2014). There, this court found that the petitioner had established a prima facie case of discrimination under *Batson* where "the prosecutor exercised 78 percent of her peremptory challenges to exclude minorities, despite the fact that minorities composed only 28 percent of the venire at its inception, and 31 percent at its conclusion." *Id.* (citation and internal quotation marks omitted). Taylor made a prima facie showing under *Batson*.

B.

At this point, the *Batson* analysis would typically proceed to steps two and three. But the prosecutor offered no race-neutral reason for his strikes. *Batson* makes clear that if "the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that [the] petitioner's conviction be

reversed." 476 U.S. at 100.  Thus, Taylor's *Batson* claim should be resolved in his favor at step two.

When a trial court fails to carry out the *Batson* process, courts sometimes remand to the district court to hold an evidentiary hearing to determine the prosecutor's state of mind during jury selection.  *See, e.g.*, *United States v. McMath*, 559 F.3d 657, 665–66 (7th Cir. 2009); *Love v. Scribner*, 278 F. App'x 714, 718 (9th Cir. 2008) (mem. op.).  However, a remand here would be a futile exercise.  For one thing, more than thirty-four years have passed since Taylor's trial.  *See Snyder*, 552 U.S. at 486 (remand would be futile after eleven years had passed since the trial).  For another, Taylor's prosecutor has passed away, as has the trial judge.

In *Batson*, the Supreme Court remanded the case for further proceedings "[b]ecause the trial court flatly rejected the objection without requiring the prosecutor to give an explanation for his action."  476 U.S. at 100.  Here, however, the trial court allowed the prosecutor to respond to Taylor's objection to his use of peremptory strikes on the alleged ground of race.  In response, the Jefferson County assistant prosecutor stated:  "In accordance with case law, the Commonwealth has no other rational reason--if I strike all [of the "black folk"] it *then* becomes objectionable under the cases coming from, as I understand it, coming from California." (Emphasis added.)  While my colleagues characterize this statement as "almost incoherent[ ]," I view it as an admission that the prosecutor exercised his peremptory challenges based on race. *See* Section II.C., *supra* (for the statement presented in context).

Other powerful evidence Taylor presented at the postconviction hearing in state court bolsters this reasonable conclusion:  (1) passages from the Kentucky Prosecutor's Handbook, stating that jurors from a minority group with a possible grudge against law enforcement or sharing a racial or national background with the defendant were not "preferable" for the prosecution; (2) a Kentucky trial judge's observation that she discharged a jury panel in a particular case because the Commonwealth's Attorney used peremptory strikes to remove all African American jurors on the venire and because of her knowledge that the Commonwealth had utilized its strikes similarly in other cases; (3) a former Jefferson County public defender's testimony that he observed the Commonwealth's pattern and practice of using peremptory strikes to remove African Americans from jury venires; (4) a private attorney's testimony that he had

observed the same pattern and practice by the Commonwealth in many murder cases; and (5) a former Assistant Commonwealth Attorney's testimony about that office's understanding that prosecutors should strive to strike jurors with the same ethnic background as the defendant and that the same Commonwealth's Attorney who prosecuted Taylor believed that having African Americans on a jury panel was not desirable.

Ultimately, the prosecutor's "no other rational reason" statement certainly does not articulate a race-neutral reason for striking African American jurors. Thus, the Commonwealth failed to satisfy its "extremely light burden" at step two. *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999).

A "trial judge's failure to adhere to the constitutional framework" of *Batson* may "complicate[ ]" appellate review, but it typically does not preclude resolution of the case. *Rice v. White*, 660 F.3d 242, 258 (6th Cir. 2011). *Rice* provides a roadmap for what to do where, as here, the trial court neither acknowledges the *Batson* standard nor attempts to apply the three-step analysis: we may nevertheless examine the trial record and "the context of the proceedings" ourselves. *Id.* at 258–59. In that case we concluded that the trial court had, in its own unorthodox way, rejected "the prosecutor's race-neutral reasons" and "f[ound] at step three that the prosecutor engaged in invidious discrimination." *Id.*

Like in *Rice*, the trial court here did not follow the *Batson* framework (nor could it have been expected to at the time), but the record compels a similar conclusion. The prosecutor was allowed to offer a race-neutral reason for his peremptory strikes. He took the opportunity to respond, but failed to satisfy his burden at step two. While the record here does not show the normal course of a *Batson* challenge, it tracks a specific situation the Supreme Court described in *Batson*: a prima facie case coupled with a prosecutor's failure to "come forward with a neutral explanation for his action" requires reversal.[12]  476 U.S. at 100.

The Commonwealth invites us to consider other reasons why the prosecutor *might* have stricken the African American jurors. That would be improper, as the Supreme Court has made

---

[12]It makes no difference that the trial court eventually checked a box in the Notice of Death Sentence Review indicating that African Americans were not systematically excluded from the jury, as the majority opinion repeatedly highlights. At step two of *Batson*, the burden is on the prosecutor, not the trial court.

clear that post-hoc arguments cannot work under *Batson*. *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis."). Scouring a cold record for reasons that might explain the prosecutor's strikes nullifies a prosecutor's duty to offer race-neutral rationales at step two (and would improperly insert our judgment for that of the trial court's at step three). *Id.*; *see also Johnson*, 545 U.S. at 172 ("The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question."). So, while the prosecutor had submitted his juror chart to the trial court at the time Taylor lodged his objection, that is not enough.[13] A "prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenge[ ]." *Batson*, 476 U.S. at 98 n.20 (citation and internal quotation marks omitted). This the prosecutor did not do.

Finally, although the facts of the crimes as found by the jury are atrocious, we do not evaluate whether the *Batson* violation was harmless. *Batson* "involves a structural error, which is not subject to harmless error analysis." *United States v. McFerron*, 163 F.3d 952, 956 (6th Cir. 1998) (internal quotation marks omitted).

IV.

Victor Taylor was prosecuted in Jefferson County, Kentucky by the same prosecutor's office as James Batson. Both African American defendants alleged that their prosecutor unconstitutionally struck jurors because of their race. The Supreme Court's decision in Batson's case provides a strict procedure to combat individual and institutional invidious racial discrimination in the selection of juries. That process was not followed in Taylor's case. Because this case presents the identical constitutional violation that occurred in *Batson v. Kentucky*, I would reverse the denial of Taylor's § 2254 petition and grant conditional habeas relief. I therefore respectfully dissent.

---

[13]Moreover, the prosecutor's juror chart listed the race of each potential juror. This hardly furthers the Commonwealth's argument that the strikes were race neutral. *See Foster*, 136 S. Ct. at 1744 (on prosecutor's juror chart, "the names of the black prospective jurors were highlighted in bright green," "[a] legend in the upper right corner of the lists indicated that the green highlighting 'represents Blacks,'" and "[t]he letter "B" also appeared next to each black prospective juror's name." (citation omitted)).